for the appellant, Ms. Vail, and for the appellee, Mr. Mages. You may proceed. Thank you, Your Honor. Your Honor, do you intend to make a motion for rebuttal? Yes. May it please the Court and the Counsel. Your Honors, my argument is very straightforward on this. I think the first thing I really wanted to address today in front of you, and I hope you'll do the same for me, because I'm a little winded, is that the State keeps trying to focus its argument on this idea that my client, Ms. Stoppelworth, identified herself in these photographs. Your Honors, I submit to you that is a red herring. It doesn't matter that she identified herself. Well, I think you're not disputing that she did. She did identify herself. She did. It's the significance of that you're disputing. Yes, Judge. My client could have identified herself sitting on a rainbow. It's still her. She's still there. It's still her that she's identifying, but that doesn't mean she ever actually sat on the rainbow. And that's the issue in this case. The issue in this case is the foundation for these, what they have called photographs, but are actually screenshots of what is purported to have been a live feed. The problem with that is there was no one with personal knowledge in this case to testify regarding how that video system actually worked. So the issue is Mr. Bryant comes and testifies, well, this is a live feed because I have a live feed, and it's all the same website, so therefore everything must be a live feed. Then Detective Lynn comes and testifies, well, I talked to some guy in Ireland, and he said that they get these screenshots every five minutes. The problem is we don't know if this was a live feed or not because nobody with personal knowledge, nobody from the company, nobody from the website came and said, these videos can only be live feed. I'm sorry. I'm sorry. He's pushing up on my lungs here. Nobody from the website came and said these can only be live feed videos. So we don't know if this video was made in advance. We don't know if it was altered. We don't know what he did to the images that Mr. Bryant saw. Is there any suggestion that any of that happened? I'm sorry. Say that again. Is there any suggestion that any of that happened? It could have. We don't know. No, no, that's not my question. Is there any suggestion that any of that happened? There isn't, Judge, but that's because we didn't have the people there to testify. This reminds me also of chain of custody context where you have arguments that, Judge, we don't know who could have done any of this, and it was supposedly sitting in this locker for a day before the next guy picked it up, and what happened to it during that day's time? Who had access to it? Who could have done it? And, of course, the question is, is there any suggestion that it was tampered with, Counsel? I understand, Judge, but I don't think this is a chain of custody issue. This is a foundational issue. This is an issue of we don't know how the video worked. We have no idea how that system worked, and because we have no idea how that system worked, we don't know. We don't know if it was a live feed. I don't know how cell phones work, but apparently the Supreme Court is having to deal with that issue, but they're dealing with it on a privacy issue. I doubt if they get very much into the theory of how phone messages and texts are transmitted. I understand, Judge. I think the difference between a cell phone and what we're talking about now, if I had a cell phone and I took a video with my cell phone, you could call me and put me on the stand, and I could say, yep, that was my cell phone, and I took a video, and that's the video I took. We don't have anybody here who can testify to that. There's nobody here who can testify to that. We don't know how this video or when this video was created. We don't even know that it was live. It could have been something he made up. Who is he? Mr. Long, I believe, was the individual who was responsible for having the camera in the apartment that night. Remember Mr. Long. They were living in Kansas. Mr. Long had purportedly had the video system that Mr. Bryant testifies. Mr. Bryant, who's never met Mr. Long, testifies, well, that's definitely a live feed because that's what I have. It's a live feed, and it's the same website, so it must all be a live feed. Mr. Long is the only person who knows how that video system was working, and Mr. Long was the call to testify. So we don't call Mr. Long. There should have been somebody from the company, somebody from the website, somebody who made that camera who could testify. This website only supports a live feed video, or this website can support a prerecorded video. We don't know that. We don't know that. And that was the problem with the foundation in this case from the beginning. I think that it's wrong. The argument is, and with respect to Mr. Bryant's testimony, my argument is not that it was wrong for him to testify about what he saw on a live feed. I agree. If he saw it on a live feed, he could testify to it. The problem is we don't know that it was a live feed, so how could the state have ever, in any circumstance, laid the proper foundation for him to be able to testify to what he saw, that maybe it was a live feed, maybe it wasn't, maybe it was some video that somebody made? We don't know. We just don't know. And I think that's the problem with this evidence, because there's no way to verify its accuracy. And that's the issue here. It's not about my client identifying herself. It's not about Mr. Bryant testifying to a live feed. Well, we're in a new world now with all this social media stuff, and apparently this is a fairly constant matter, people watching things on social media. Why shouldn't a witness be permitted to testify to what he saw and say, yeah, that's what he saw? Judge, I'm not saying that he can't. The problem is we don't know that that's what he saw because we don't know. Well, he's saying, no, we do know that's what he saw because he told us that's what he saw. We don't know that that's actually what happened. Well, but that's my point is, why shouldn't he be permitted to say, this is what I saw when I was going through, as he described, just randomly going through feeds and describe how he was doing that and let the prior effect decide it. Why shouldn't we accept this testimony in the absence of some suggestion of tampering or it's tainted or it's been, as opposed to just what amounts to idle speculation that the guy with the tattoos looked like a jerk. He made it all up. I'm a little skeptical that he's up to that, frankly. Judge, I'm not disagreeing with you that he can testify to what he saw. Our point is that there's got to be a foundation for how this video- Why should there have to be a foundation beyond his testifying what he saw under the context which strongly supports the inference it was live. Because your point that we live in a new age of social media is exactly right because people have access to these things. You can make videos on your iPad, your iPhone. You can just create a video. You can cut and paste stream people into a video and make your own video that's not live but you could make it look very live and you could stream that online. And then how do I know that that's real? How do I know that that's actually happening? Well, in the context of this very case, since it's involving Shaila Stoppilworth, shouldn't the prior effect be able to rely upon her when she says, yeah, that's me, to say, and by the way, I wasn't doing any of this stuff. This is all Photoshopped or its equivalent. Remember what her testimony was, though, Judge. Yes, that's me, but I don't remember this happening. I don't remember seeing him. You remember the incriminating picture that we had? I don't remember seeing that. I don't remember seeing him doing anything that was described by Mr. Bryant in Tennessee. Yeah, because I was too drugged up. Not that this was I wasn't there and all the rest of this. I understand, Judge, but I think it's more than that. There's no suggestion of tampering here before the prior effect, is there? I don't think there has to be a suggestion of tampering. Well, that's not the question I asked. Before the question of does it have to be, the question was, is there any? Judge, on the record, no, I didn't see it. I didn't see it, but I don't think it has to be. And, of course, you argue the silent witness doctrine applies here, but the silent witness doctrine is a situation that has risen when the next day after an event, people show up and, gee, our place has been burglarized, and let's see what our surveillance records show, and there it is. And the Supreme Court, under those circumstances, where no one saw anything while it was happening, has now said, well, before we let this all in, you ought to have some explanation of how this worked. This seems to be a rather different situation. What if this were, for instance, a fellow who used a periscope as he was watching these events? Would he have to be able to explain how periscopes work in order for him to testify? I think he would have to explain to some extent how the periscope works. Yes, I do. He'd say, well, you know, I put this up, and I was able to see two stories up. That's an explanation, Judge, which is more than what we have here. We don't have an explanation. He said, how does that work? Well, I've got some mirrors in here, and I don't really know. Absolutely, but that's an explanation of how it's working. We don't have to. So that would be satisfactory. I haven't studied periscopes, so I don't know, but I think on its surface we're headed in the right direction. Well, isn't this also kind of like a situation where someone says, gee, I recognize Tom's voice over the phone, and you say, well, how does this phone work? What do you mean you recognize it over the phone? No, Judge, because in this case we didn't have. Why would that? And he says maybe it was recorded. How do you know? Who were you talking to? You know what's crazy? I just watched a Columbo episode where they did that, and the guy recorded it, and he cut the tape, and that's exactly what he did. Hello, who is this? So is this the CSI effect at the appellate level? No, Judge. No, Judge. I think the problem is the court's assessment is right. This is new technology, and there are lots of things we don't know, but that's part of the problem here. People have so much access to so many different types of technology, and it's so easy to learn how to use, that even though, as the court says, there's not a suggestion. Except for some of us. I'm sorry? Except for some of us. Even my grandma has learned how to use Facebook. The problem is that it's so easy to learn how to use, that even though there's not a suggestion of tampering, as the court says, it doesn't mean there wasn't. It doesn't mean there wasn't. It just means that people who were testifying didn't know. Mr. Bright, how can he know? He testified. I have no idea who these people are. I'm from Florida. I'm in Tennessee watching some live streams. Well, why isn't the inference there he's watching his own home on the live stream, checking on his cats, showing that he has to be a righteous guy to have cats? Absolutely. Okay. So he's checking on his cats, and he says, this is a live stream, a video camera, and part of it is also then this name Shiloh, I think. And I'm just curious if you can check on that, too. Why is it the inference that this is similarly a live screen that he's able to pick up on like his own home? I don't think that's a fair inference, and that's the problem. Why is it an unfair inference? Because we don't know what kinds of streams this website supports. This may not have been a live stream, and there's no evidence that it was a live stream. Well, he said he was on this channel or whatever it is where other webcam videos were being shown. Isn't that his testimony? That is true, Judge. Why isn't that enough for a trier fact to infer in the absence of anything else that, like the live screen from his own home, this is a live screen from someplace else? Because there's no way to know whether this website could have supported other things. He doesn't know whether this website supported other things. All he knows is I've got a live stream, it's on this website, so therefore I think everything on this website is a live stream, and I don't think that's a fair jump to make. Why not? I'm a trier fact. Why shouldn't I be able to make that? In the absence of any suggestion that that's not what happened. Because it would be incredibly easy to upload something and say that it would be incredibly easy to upload a prerecorded video that had been doctored or altered and put it on this website and say this is a live stream when it's actually not. And without knowing whether or not that website would support that, you can't foreclose the possibility that this was an altered video. What if it weren't a live feed and it was just a recording? Just a recording. I think then we have even more serious problems. What would be the serious problem then? The reason that Mr. Bryant could testify, if he could testify about this, is that it was live. He was watching it happen. So it was the same as if he was there and he was watching it through a camera. If it's prerecorded, we have no idea that those events actually happened. We have no idea that somebody didn't alter or tamper with this video and create... So it's the speculation of altering or tampering which is why you don't think it should be admissible. It is, Judge, because we don't know where it came from. We don't know where it came from. So in a situation like this, in order to address that speculation, which when I say speculation we have no hint in this record that it's been altered. You're just saying it's possible. They'd have to bring in the guy from Ireland whose company this is and we'd have to literally bring in international people so as to satisfy the trier of fact that, you know, the possibility this might be altered, it wasn't. Is that the requirement? Or someone who knew how that camera worked, the specific model he had. How could you... You're watching it live. How would you even have any idea what sort of camera... And, of course, that's the silent witness stuff. Why would you care what kind of camera this is if you're watching it? Hey, this is what I saw. I'm sitting in my hotel room or whatever and this is what I saw. Why does it matter? Part of the foundational requirement, Your Honor... That's for silent witness if it applies. Is that you have to show reliability. I think even for photographs you have to show some sort of reliability. No, no, actually that's an excellent point, Counsel. You never have to show that. Here's the question. Officer, you were at the scene of the burglary at 3 o'clock in the morning? Yes. I'm showing you this photograph. Does it accurately portray what it purports to portray, namely what that building looked like? Yes, it does. Officer is the cross-examination. What kind of camera was used to take that picture? I have no idea. And I object, Judge, this is not admissible. I don't think that would work. Isn't that correct? That is correct, Judge. Well, then why does it matter in this instance what sort of camera was used? Because the type of camera wasn't just taking a still photo. I wasn't just clicking a picture of you and saying, look, this is Judge Seidman, isn't this him, isn't this him? But isn't the question, does this accurately portray what you saw? But, Judge, in this case, how do we know what he saw was actually happening? That's the problem. Well, wouldn't that be the case in every single, and I think maybe most often they're federal cases, cases involving child pornography on somebody's computer. And I think the difference with child pornography, Judge, is that at that point it doesn't matter. We don't care because these are horrible pictures taken of children doing things that children should never be exposed to. In this case, what the state's allegation was is that my client was allowing her son to be subjected to things he shouldn't be subjected to. We have no evidence of that because the only evidence was this purported live stream, which I think it's just as much speculation to say it was a live stream as to say it was prerecorded. Okay, it's prerecorded. Right. The question is, can a digital image be altered? Yes, absolutely. Okay, and the next question is, is there any suggestion that this image or series of images have been altered? Well, that's a question, but when you have the three parties identified and you also have the same time period, December of 2012, which is the time that he also viewed these, the witness viewed these, and the witness then adds to that, I have access to live feeds because I have that set up to watch my animals. And I received what I believed to be another live feed, and I saw these things happen. So I know who the people are, or later discovered who they are and their location and the time period, and I'm able to accurately, I'm able to say those images represent what I see. Isn't there a substance there which either be, you either call it a foundation or it becomes a foundation, or it's sufficient unless there is some hint, at least a hint of altering. Or a hint that if they were made in November, but it looks like a live feed in December, so what, unless there's a hint of alteration. I think that's the point that I initially started out with. It doesn't matter that she identified herself. Right, but where's, your suggestion is there need be no hint of the improper display of these or a change or alteration of the image. It's, you start from the beginning. The state has to show, by foundation, essentially they have to prove these weren't altered. Yes, Judge, I think that's the purpose of foundation, so that we know this accurately represents what actually happened. So the state has to prove in a child pornography case that these were on my computer, and I had access to them, before they can talk about the fact that they seized the computer from my home and these images were on my computer. No, Judge, I don't think that it quite, no, I don't think so. I think you're talking about a probable cause issue and then what... I'm talking about conviction. I think you're talking about what we can prove at trial. Maybe I misunderstand your question. My point is that for the video, for him to testify about what he saw on this video, there has to be foundation for how the video works. In the child pornography case, we've already got the images. We already know that the images come from wherever they come from, and we're not trying to prove... But we're not trying to prove that what happened in those images actually happened, because we don't care. You have to prove that I... How did they get on my computer? You have to prove that you had access to them, but that's different. How did they get on my computer? I didn't download them. Maybe that's your defense. Maybe that's your defense. The defense, this didn't happen. Right, but that's not what we're talking about here, because there you're talking about actually possessing the photos. We're not talking about that here. Here we're talking about what actually happened on December 5th. Did that actually happen, or was this a live feed, or was this something that Mr. Long put together in his spare time to stream online? We'll have additional time on rebuttal. Mr. Majors. May it please the court, counsel, as I listened to counsel, her primary message was that there was an insufficient foundation for this viewing by Bryant to be a live feed. If there's a live feed, counsel, I think, has admitted we don't go into the silent witness rule. I took notes from their statement of facts as to what might be a foundation. Now some of it comes in as hearsay, but it wasn't objected to. Bryant used his equipment to monitor his house and his pets while he was away on vacation, which indicates his equipment was working and he knew what a live feed was. He testified his equipment was working properly when he saw the Shiloh website. He testified it was a live feed. He, I think, got a hold of somebody in Ireland, along with the other law enforcement officials that got involved in this, and the person in Ireland told him it was a live feed. Now again, that's hearsay, but no one objected to it. Detective Lynn, who got involved in this, worked with the FBI and talked about the FBI's foundational efforts in this case, and there was a criminal case that apparently never went anywhere against Mr. Long, and then there was this case, and the FBI was involved for child pornography, I think. So that all came in. That foundational evidence came again. Again, it's hearsay. Detective Lynn either talked to Gallagher, this guy in Ireland, or the FBI did, who told her that the photos were accurate and that it was a live feed. Catherine Curtis was a witness for Respondent. At one point she testified that the mother told her, told Curtis, that there was a webcast of Long viewing child pornography and masturbating, and there was a sexual situation between L.S. and Long. That's their witness talking about what Respondent told her. Then we go to Respondent, and I've listed all the times that she identified the photographs in court, and she admitted she was there, she admitted the dates were right, she admitted the times were right, and as we all know by now, every five minutes a photo is taken in Ireland. And she also testified that Mr. Long used his equipment to monitor his pets, who happened to be dogs, his pets are dogs, and Mr. Bryant's pets are cats, and he used it to download the movies, illegally, but download movies. So if they're looking for a foundation for admissibility of this evidence, or to show that it's a live feed, it's there. It was presented at trial, directly and through hearsay, and they didn't object to any of it. That's her most credible argument, and that's my response. I'll try to answer the court's question. Counsel, his argument was exactly what I was just talking about. It was exactly the problem. Almost all of the foundation was Mr. Bryant. Well, this is my live feed, and I know that mine is a live feed, and that's how my live feed works, but nobody knows how Mr. Long's works. How do we know that this is, how do we know that Mr. Long's is a live feed? And in fact, in my client's testimony, she even admitted, I don't know how his camera equipment works. He does that. I have no idea. I can't tell you how it works, because I don't know. So the only person we have testifying is Mr. Bryant, who, by his own admission, can know nothing, because he doesn't know any of these people involved. He's never met any of these people involved, never been to Kansas City, never seen Mr. Long's equipment. So how can he know that he's looking at a live feed? He assumes it is. He assumes it is, because that's what he's watching on his. But there's no way he knows, and that's the problem. That is the problem. Why does it matter whether or not it's a live feed? Because, sir, I think if it's not a live feed, then there is a possibility that it could be altered. Counsel pointed out that my client, in her testimony, said that Mr. Long illegally downloaded videos. We don't know what kind of videos those were, but his equipment was at least set up to be able to download videos, and we don't know if it was set up to alter those videos, to splice videos, to recreate things that didn't happen. That's the problem. That's why it matters if it's a live feed. And I don't think there needs to be a suggestion of tampering for that to be a problem. Your argument is that, as a foundational matter, the state has to rebut any suggestion of tampering? I think they have to at least lay sufficient foundation that we can reasonably rely on the fact that this is a live feed that we're talking about. That we can all agree, yep, I'm pretty sure, 99 percent, that's a live feed, and we don't have it. You are the prosecutor in this case. Whose testimony would you try to get to meet the standards you're now suggesting should be met? I think it would be easy enough. There are IT people all over, everywhere. All you have to do is contact one of them, say, this is the video stream I have, this is the website it comes from. I'm not sure I understand what you mean when you say there are IT people everywhere. You mean there's some person in Springfield, Illinois, who would be able to testify that this is a live feed that Mr. Bryant saw? Perhaps, because just like the FBI, just like the FBI can issue their subpoenas and go back and they can trace, they can trace just like on a CSI, they can actually trace what kind of camera, when it was taken, et cetera, et cetera. There are IT people who could do that right here in Springfield, Illinois, who could say, I traced this back, I know it was this type of camera, I know that this was the type of function, this was the algorithm I was looking at. Absolutely, I think absolutely that's doable. Well, of course, where are the records of this? This would be in Ireland or something, wouldn't it? But Ireland obviously was complying. I mean, according to all testimony, all we have to do is issue the subpoena. The FBI issued the subpoena and got the information. I don't think that's a problem. That's all I have. Thank you. Okay, thank you. Let's go ahead and recess until the readiness of the next case.